IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| IN THE MATTER OF CUSTODY OF: ) | No. 32441-9-III |
| ) | |
| ALD, ) | |
| ) | |
| KIMBERLY MOEHLMANN, and ROD ) | |
| MOEHLMANN, ) | |
| ) | PUBLISHED OPINION |
| Respondents, ) | |
| ) | |
| and ) | |
| ) | |
| KELLY M. LAMBERT, mother and ) | |
| JUSTIN MAYFIELD, father, ) | |
| ) | |
| Appellants. ) | |
| ) | |

FEARING, J. — A most difficult and humbling decision for judges is determining who should be granted, among competing parties, custody of a young child. The decision shapes the child's entire lifetime. Rendering such a decision is similar to playing God. King Solomon suggested severing a baby in half in order to discern which of two women deserved custody of the child. Since we lack the wisdom of Solomon, we resort to another decision making process.

This appeal concerns a dispute between the grandparents and mother of five-year-old Betty Sue as to who should have custody of the girl. Betty Sue is a fictitious name. Betty Sue's grandmother and step-grandfather are Kimberly and Rod Moehlmann. The trial court, after an evidentiary hearing, granted the grandparents' nonparental custody petition over the opposition of Betty Sue's mother, Kelly Lambert. We reverse the trial court and grant Lambert custody of her daughter, not because we are pleased with her parenting but because of the potent constitutional right to the care, custody and companionship of one's biological child. Due process demands that a parent receive custody of a child unless the parent is unfit or custody of the parent would cause actual detriment to the child's growth and development. After reviewing the trial record, we find a lack of evidence to establish either standard.

## FACTS

Appellant Kelly Lambert is Kimberly Moehlmann's daughter and Rod Moehlmann's stepdaughter. The Moehlmanns are respondents. In May 2007, Kelly Lambert joined the army. At boot camp, Lambert fell from a rope tower and severely injured her back. Lambert developed clinical depression from the serious injury and the realization of her loss of a coveted military career. In 2007, Lambert attempted suicide. The army thereafter discharged Lambert with the twin disabilities of manic depressive disorder and chronic lower back spasms. Her medical discharge order noted that

2

Lambert's psychiatric history of chronic depressive symptoms began at age eleven and included multiple suicide attempts since 1999.

As a disabled veteran, Kelly Lambert receives $2,900 a month. At trial, Lambert could not recall when she last worked. Since 2007, Lambert has participated in mental health counseling.

Following her 2007 military discharge, Kelly Lambert resided in Utah. On December 19, 2009, Lambert gave birth to Betty Sue in Ogden, Utah. The father, Justin Mayfield, has not participated in these proceedings. At the time of Betty Sue's birth, Lambert lived with boyfriend, James Decou. After Lambert learned of Decou's unfaithfulness in May 2010, she moved with Betty Sue to Olympia, to live with her mother and stepfather, Kimberly and Rod Moehlmann.

Rod Moehlmann has never raised children. Nevertheless, he testified to Kelly Lambert's care for Betty Sue while Lambert resided with the Moehlmanns in Olympia. He opined that Lambert was unfit to parent. Kimberly Moehlmann, rather than Lambert, changed Betty Sue's diapers and bathed the infant. When Rod returned home from work in the evenings, Kelly was absent and Kimberly cared for Betty Sue. Sometimes Lambert sat for hours in a Denny's restaurant with Betty Sue strapped in a car seat next to her, while Lambert spoke to other customers.

Kelly Lambert began courting Joe Favazza in June 2010. Favazza plays a major role in this litigation. Within a week of meeting Favazza, Lambert learned of Favazza's

3

past conviction for child molestation. Kelly's mother, Kimberly Moehlmann, also learned of Favazza's conviction.

In 1999, Joseph Favazza was convicted of child molestation in the first degree. The superior court record lacks the facts underlying the conviction. On July 20, 2005, Joseph Favazza left prison after serving his sentence and undergoing treatment, but he remained labeled as a level one sex offender. On a scale of one through three, a level one sex offender is deemed the lowest risk for recidivism. RCW 72.09.345(6). Each year, Favazza must register with the local sheriff as a sex offender.

In August 2010, Kelly Lambert and Betty Sue absented the Moehlmanns' Olympia home and resided with Joe Favazza in Bremerton. Betty Sue was then nine months of age. Rod Moehlmann contacted police and Child Protective Services (CPS) and asked about protecting Betty Sue from Favazza. The record provides no response from CPS or law enforcement to Moehlmann's inquiry.

Joe Favazza, Kelly Lambert, and Betty Sue relocated to Utah in August 2010. At trial, Kimberly Moehlmann testified that Kelly Lambert, while in Utah, left Betty Sue with Kelly's friend Sabrina Badger for days at a time. The source of Moehlmann's information was Badger. Kimberly and Rod Moehlmann post mailed and electronically mailed Lambert's Utah landlord and informed the landlord of Joseph Favazza's sexual molestation conviction. The Utah landlord insisted Favazza move. In November 2010, Lambert, Betty Sue and Favazza returned to Bremerton.

Kelly Lambert, Betty Sue, and Joseph Favazza dwelled collectively in Bremerton until August 2011, when Lambert and Favazza separated. Lambert testified at trial that during cohabitation she never allowed Favazza unsupervised visitation with Betty Sue. She had two rules: Favazza could not change diapers or be alone with Betty Sue.

In October 2011, Kimberly and Rod Moehlmann moved to Spokane. Kelly Lambert and Betty Sue soon followed to Spokane to live with the Moehlmanns. Kimberly Moehlmann testified that, in the fall of 2011, Lambert and Betty Sue lived with her and her husband for two weeks, during which time she cared for Betty Sue almost exclusively while Lambert drank coffee and visited with friends at coffee shops. Lambert testified to living with the Moehlmanns for two months at this time.

Kelly Lambert, with Betty Sue, next relocated to Utah to live with Lambert's new beau, Jeffrey Pollard. Lambert testified she moved from the Moehlmann home because of stress resulting from Rod's drinking and his poor treatment of Kimberly. Both sides hurled mire at one another during the trial. According to Lambert, the alcohol drinking of her mother and her stepfather endangered Betty Sue. Lambert did not disclose to her parents the reason for her leaving.

At trial, Kimberly Moehlmann testified about a phone call with Kelly Lambert after she returned to Utah:

> At one point I overheard [Kelly Lambert] and Jeff Pollard in a fight over the phone when they didn't know that they had called. That sounds like domestic violence to me when you heard slapping of a person. . . .

5

From the sounds of the cry and the slap, it would have been Jeff slapping Kelly.

Report of Proceedings (RP) at 151-52. Beyond Moehlmann's testimony, no evidence confirms any domestic violence between Lambert and Pollard.

Kelly Lambert discovered infidelity by Jeff Pollard. Thus, in February 2012, Kimberly and Rod Moehlmann journeyed to Utah and assisted Lambert and Betty Sue in a return to Spokane. Lambert called the Moehlmanns for this help. Assuming she included Rod Moehlmann in the request for aid, Lambert did so because she had learned to forgive others.

At trial, Rod Moehlmann criticized Kelly Lambert again for her parenting while Lambert and Betty Sue resided with the Moehlmanns in Spokane. Lambert rarely bathed or fed her daughter or changed the youngster's diapers. When Betty Sue screamed during the night, Kimberly awakened Lambert, but Lambert asked Kimberly to care for the baby. Rod Moehlmann last observed Kelly Lambert's parenting skills in the summer of 2012.

After residing with her mother and stepfather for several weeks in Spokane, Kelly Lambert, with her young daughter, relocated to reside with her friend, Jeri Ann Cozza, also a denizen of Spokane. Lambert and Betty Sue lived with Cozza until July 20, 2012. Lambert testified she moved from her parents' home because the home lacked room for Betty Sue and her. Lambert slept on a couch, while Betty Sue, at age two, slept in a

playpen.

In her appeal brief, Kelly Lambert claims Jeri Ann Cozza is her stepsister. No testimony supports this claim. Lambert also refers to Cozza as Betty Sue's aunt, although the two lack any familial relationship. We know nothing about the length and nature of Lambert's and Cozza's friendship.

Jeri Ann Cozza has felony convictions for identity theft and financial fraud. Cozza dated Jeffrey Hoffman, who resided elsewhere. Hoffman visited Cozza at her, Lambert's, and Betty Sue's mutual home. Hoffman garnered a criminal conviction for threatening to kill someone. Kelly Lambert knew not of Hoffman's and Cozza's criminal history until after Kimberly and Rod Moehlmann filed their nonparental custody petition.

Kimberly and Rod Moehlmann continued to visit Betty Sue, while the two-year-old resided in Jeri Ann Cozza's home. According to Kimberly Moehlmann, she cared overnight for Betty Sue two to four nights a week. At the Cozza home, Rod Moehlmann observed Kelly Lambert sitting on the house's front steps smoking and texting, while Betty Sue sat in a playpen in a bedroom with the television playing. Cozza fed and bathed Betty Sue. Kimberly Moehlmann observed Lambert's lack of attention to her child. Lambert applauds herself for arranging a pediatrician and speech therapist for Betty Sue during this time.

By March 2012, Kimberly and Rod Moehlmann observed Betty Sue "dry hump" a stuffed animal. Clerk's Papers (CP) at 54. According to the Moehlmanns, each also

observed Betty Sue masturbating and heard her experiencing night terrors. On one occasion, when Betty Sue engaged in sexualized behavior, Kimberly Moehlmann told her to stop. The child replied that she could not. Kimberly asked why, and the girl responded that "[daddy] says I have to." RP at 172. The Moehlmanns worried that Betty Sue's behavior portended that Joseph Favazza molested the young girl. Kimberly and Rod Moehlmann called the Spokane Valley police. The record does not confirm a call or disclose the response of the police. At trial, Rod Moehlmann stated that Kelly Lambert expressed no concern for her daughter despite Betty Sue's behavior.

Kelly Lambert agreed during trial that Betty Sue "dry humped" her teddy bear. RP at 343. Lambert claimed that her daughter's behavior did not begin until Betty Sue resided at the Moehlmanns' Spokane house. Lambert had no explanation for the behavior. Lambert testified at trial that she offered CPS to examine Betty Sue. Lambert did not mention the date of the offer or disclose CPS' response.

On the morning of March 28, 2012, Kimberly Moehlmann, Kelly Lambert, and Jeri Ann Cozza transported Betty Sue to Providence Holy Family Hospital emergency room, where Dr. Brett Enlow examined and evaluated the toddler. We do not know which of the three ladies initiated the hospital visit. According to Lambert, she went to the hospital with her mother and Betty Sue, not because she believed her daughter was molested, but to satisfy her mother. Betty Sue was then two years and three months old.

On March 28, Kimberly Moehlmann informed the Providence Holy Family

8

emergency room that Betty Sue's genital area appeared odd and discolored. Dr. Enlow found Betty Sue to be "a cute little girl who does not appear to be in any acute distress." CP at 55. Dr. Enlow examined Betty Sue's vaginal and anal regions and found no abnormality. Enlow concluded that CPS intervention was unneeded but that a pediatrician should examine Betty Sue.

The Holy Family Hospital March 28, 2012 medical chart note reads that Betty Sue's immunizations were up to date. The medical record indicates that Betty Sue resides with her mother and grandmother, not her mother and Jeri Ann Cozza. The report also reads that Betty Sue is developing normally.

Later on March 28, 2012, Kelly Lambert and Kimberly and Rod Moehlmann took Betty Sue to pediatrician Deborah Icenogle, of Providence Family Medicine, for the purpose of evaluating the young girl for possible molestation. Rod showed Dr. Icenogle a cell phone video of Betty Sue humping a stuffed animal. One family member reported that Betty Sue once handed him or her a naked Barbie doll with its legs spread wide apart. Dr. Icenogle wrote in her chart note: "Physical examination is without trauma or signs of infection at this time. The patient's behavior which has been concerning to the mother and the grandparents should be thoroughly evaluated and the patient will be referred to a child sexual abuse evaluation team for careful assessment." CP at 59. Icenogle also noted a family history of night terrors and the absence of any daytime screaming by or fear in Betty Sue. While Lambert was absent from the examination

room, Kimberly Moehlmann deceptively told Dr. Icenogle that Lambert presently resided with Joe Favazza, but that Favazza was currently incarcerated in Kitsap County for child molestation. Contrary to the Providence Holy Family Hospital chart note, Icenogle concluded that Betty Sue had received no immunizations.

Pediatrician Deborah Icenogle's March 28 charge notes reference a referral to CPS. The note states that Ginger Keeny will evaluate the safety of Betty Sue's home environment. Trial records reflect no later evaluation by CPS or Ginger Keeny.

On April 3, 2012, Kelly Lambert returned Betty Sue to Providence Family Medicine, where pediatrician Anne Marie McCarthy performed a well child examination on the young girl. Dr. McCarthy concluded that Betty Sue was developing normally for her age.

The April 3 notes of Dr. Ann Marie McCarthy read, in part, that Betty Sue was living with her mother and mother's "half-sister," who may be Jeri Cozza. The chart notes further declare that DSHS entered a plan concerning Betty Sue's care and the plan permits no one with a criminal background to reside in Betty Sue's home. The court record does not include a copy of the plan. Dr. McCarthy's chart notes also read that the girl's grandmother is excluded from the home.

On June 18, 2012, Kelly Lambert delivered Betty Sue to Dr. Deborah Icenogle because of a concern for Betty Sue's hearing and speech. Lambert reported that she previously took her daughter to an ophthalmologist, who dismissed any sight deficiency.

10

Dr. Icenogle found Betty Sue's speech delayed and referred the youngster for a hearing test and speech therapy. Dr. Icenogle's record of the visit reports that CPS closed its investigation and Lambert resided with her sister.

On July 9, 2012, a court entered a protection order, at the request of Kelly Lambert, restraining Kimberly Moehlmann from contact with Lambert. Our court record does not include a copy of the restraining order. We do not know the duration of the restraint, although Kimberly Moehlmann testified the restraining order is no longer in effect. Kimberly Moehlmann testified to events leading to the protection order:

> CPS had just closed a case which involved [Betty Sue] with Joseph Favazza. Kelly was wanting to go back with Joseph Favazza and knew I would object with her taking [Betty Sue] back into that environment.

RP at 127. Our court record lacks any records from this purported CPS case. Kelly Lambert testified she grew fearful that her mother intended to take Betty Sue from her.

On July 10, 2012, Kelly Lambert took Betty Sue to pediatrician Anna Barber, at Providence Family Medicine, because of a concern of allergies or Betty Sue having contracted whooping cough. Dr. Barber found nothing wrong. Dr. Barber's chart note records that Betty Sue's immunizations were "up to date." CP at 70.

Also in July 2012, Kelly Lambert hired an attorney to draft pleadings to grant Jeri Ann Cozza custody of Betty Sue because of a fear that her mother would take Betty Sue from her. Cozza conceived the idea of petitioning for her to be custodian. Trial exhibit 1 is the nonparental custody petition signed by Kelly Lambert to bestow custody in Cozza.

11

The parties did not transmit any of the exhibits to this appeals court. In the petition, Lambert falsely claimed that Cozza was Betty Sue's aunt. The petition also falsely declared that Betty Sue had only resided in the state of Washington.

On July 27, 2012, Kelly Lambert relinquished custody of Betty Sue to Jeri Ann Cozza. Exhibit 3 is a copy of the order declaring Cozza to be temporary custodian. Once again, we have not seen the exhibits. After entry of the order, Lambert lived in Bremerton near but not with, Joe Favazza. The order granted Lambert visitation rights with her daughter. Between July 27 and October 2012, Lambert spoke with Betty Sue on the telephone, but had no physical contact with her daughter.

Kelly Lambert declared at trial on the Moehlmanns' petition for custody that she did not intend custody in Jeri Ann Cozza to be permanent. She planned to regain custody of Betty Sue after her parents no longer interfered with her relationship with the young child and Joe Favazza. Lambert grew concerned about the Moehlmanns' repeated complaints to CPS. Lambert agrees that in hindsight giving custody to Cozza was inappropriate. Lambert wanted Cozza, rather than her parents, to hold custody of Betty Sue because Cozza had a comfortable home and Cozza and Lambert had developed a close relationship. Cozza and Lambert agreed to reassess custody of Betty Sue in a few months.

In a declaration supporting her petition to grant Jeri Ann Cozza custody of Betty Sue, Kelly Lambert averred that she was an "unfit parent." The order of custody reads, in

12

part:

> "Adequate Cause": . . . The mother has physical and mental health issues which do not allow her to provide proper care for the child at this point in the mother's life. The situation may change in the future.

RP at 22. Lambert agreed to the language. At trial, Lambert testified that her mental health issues in July 2012 related to depression and "worry[ing] about [my parents] pounding on my doors." RP at 24.

## PROCEDURE

On July 27, 2012, Kimberly and Rod Moehlmann filed the petition for nonparental custody of Betty Sue that is the subject of this appeal. Thus, the Moehlmanns filed their petition on the same day that a trial judge signed an order granting Jeri Ann Cozza nonparental custody of Betty Sue. In their petition, the Moehlmanns alleged that both Justin Mayfield and Kelly Lambert were unsuitable custodians for the child. Among other allegations, the Moehlmanns averred Kelly Lambert's relationship with Joseph Favazza endangered Betty Sue and that Lambert was oblivious to this danger.

Kimberly and Rod Moehlmann learned of the petition and order granting Jeri Ann Cozza custody after the Moehlmanns filed their petition. On September 19, 2012, the Moehlmanns moved to consolidate Jeri Cozza's nonparental custody petition with their own, vacate the grant of custody to Cozza, establish adequate cause to continue their nonparental custody action, approve their proposed parenting plan, and appoint a guardian ad litem.

13

On August 3, 2012, Jeri Ann Cozza took Betty Sue to pediatrician Anna Barber, at Providence Family Medicine, because of the girls' swollen lip. Dr. Barber found Betty Sue's lip to be healing fine. Barber described Cozza as "extremely good" with the two-year-old.

During trial, Kimberly Moehlmann testified that medical records from September 7, 2012 show Betty Sue to have a developmental delay. The record on appeal contains no medical records from September 7. The record before this court discloses that Jeri Ann Cozza also took Betty Sue to Dr. Anna Barber on September 13, 2012. The September 13 chart notes read, in part:

Well appearing child, appropriate for age, no acute distress.

CP at 77. Anna Barber further wrote:

[Betty Sue] has been noted in the past to have some facial features suggestive of fetal alcohol syndrome. Dev delay: receiving all appropriate services. Aunt is doing a good job of caring for [Betty Sue] and demonstrates affection and appropriate actions.

CP at 78.

On October 26, 2012, a court commissioner found adequate cause supported Kimberly and Rod Moehlmanns' petition for nonparental custody. The commissioner also dismissed Kelly Lambert's petition to appoint Jeri Ann Cozza as Betty Sue's guardian and granted the Moehlmanns temporary custody of the young girl. The commissioner granted Lambert residential visitation twice per month in four-day

increments and an additional forty-eight hours of visitation per week in Spokane. Under the temporary order, the court commissioner prohibited Joe Favazza from contact with Betty Sue. The commissioner also ordered the appointment of a guardian ad litem. Unfortunately, the parties never proceeded to garner a guardian ad litem.

On July 13, 2013, Kelly Lambert gave birth to her and Joseph Favazza's daughter, Sharon. Upon Sharon's birth, CPS intervened. CPS interviewed Favazza, deemed him a fit parent, and allowed Lambert custody of her infant. CPS has not restricted Joseph Favazza's contact with Sharon. In January 2014, due to lead-based paint in her home, Kelly Lambert moved from one residence in Bremerton to another.

Trial proceeded on February 18 and 19, 2014. Between the Moehlmanns obtaining custody of Betty Sue in October 2012 and trial, Kelly Lambert had the opportunity for four-day visits in Bremerton thirty-two times but only visited Betty Sue seven times. Lambert met one or more of the Moehlmanns in Washington's principal exchange location, Vantage, to swap care for Betty Sue. No visits occurred in Spokane. Kelly Lambert blamed the lack of visitations on a want of a vehicle until July 2013, her pregnancy thereafter, and a lack of funds. Lambert did not wish Rod or Kimberly Moehlmann to see her pregnant for fear the Moehlmanns would also take her new baby. According to Lambert, her physicians also advised against traveling while she was pregnant. During the same window of time, Lambert sent no Christmas or birthday presents to Betty Sue.

Kelly Lambert testified at trial that Betty Sue "is most bonded" with her. RP at 283. According to Lambert, when Betty Sue visits her, the daughter pays "close attention" to the mother. RP at 284. Betty Sue has seen Sharon twice and loves her little sister.

Kelly Lambert claimed at trial that Betty Sue expresses displeasure when returned to the Moehlmanns. On one occasion, Lambert struggled for one half hour to place Betty Sue in Rod Moehlmann's car.

According to Kimberly Moehlmann, the court commissioner did not allow her to be present during exchanges in Vantage because of the restraining order entered against her. Kimberly needed to remain at least two city blocks away from the situs of the exchange. Difficulties arose during one Vantage exchange and police were summoned. Kimberly insisted she sat in a restaurant at least two city blocks away. According to Moehlmann, Kelly Lambert took photos of her on that occasion.

Not surprisingly, the Moehlmanns declared at trial that Betty Sue's visits with Kelly Lambert caused Betty Sue difficulties. According to Rod Moehlmann, Betty Sue screams for a week after visits. Betty Sue was happy to return to Spokane, but her behavior becomes aggressive.

Kelly Lambert testified at trial that she continues to monthly visit a psychiatrist to treat her depression. Her mental health improves, except that the trial caused emotional problems. She is no longer manic depressive nor suicidal. Kelly takes the anti-

depressant Wellbutrin. Lambert is happier now because of the joy that Sharon brings. Lambert takes ibuprofen and tylenol for the muscle spasms in her back.

Joe Favazza testified at trial that he has obeyed the proscription against his being near Betty Sue. He further testified that, if this action is dismissed, he would live with and marry Kelly Lambert. Lambert likewise envisions someday marrying Favazza. Lambert does not believe Joe Favazza was guilty of the crime of child molestation upon which he was convicted. Nevertheless, if a court ordered no contact between Betty Sue and Favazza, Lambert would willingly obey the order in order to regain custody of her daughter.

Kelly Lambert allows Joe Favazza to visit with her and his daughter, Sharon, alone. She has no concern of Favazza being unsupervised with Sharon. Favazza sees Sharon every day. Lambert believes that Sharon thrives.

Kelly Lambert testified that, every time that CPS contacted her, she let CPS agents inspect her home and review the condition of Betty Sue. We lack the specifics of any CPS investigation, other than Lambert's testimony that CPS last investigated her home in August 2013. No CPS records were introduced as exhibits, nor did any CPS employee testify at trial.

Kelly Lambert testified that she recently completed a parenting class, despite no requirement that she participate in a class. During the class, she learned Biblical principles of disciplining a child.

17

Kimberly Moehlmann testified that, when she gained custody of Betty Sue in September 2012, the young girl had speech delays. According to, Moehlmann, Betty Sue no longer has delays. Moehlmann applauds herself for Betty Sue having no medical problems or developmental delays. Kimberly Moehlmann insisted at trial that, when she gained placement of Betty Sue, Betty Sue lacked some of her immunizations. The youngster is now current on immunizations.

Without any support in the records, Kimberly Moehlmann testified that recently CPS ordered no contact between Betty Sue, on the one hand, and Kelly Lambert or Joe Favazza, on the other hand, until the police and CPS complete an investigation. In other words, Lambert is no longer permitted contact with her daughter. We are given no details of the investigation. Moehlmann testified that Exhibit 16 supports her allegation. Again, the parties forwarded this court no exhibits.

At trial, Kimberly Moehlmann testified that she observed mental health issues with Lambert. According to Moehlmann, Lambert is depressed, sleeps all day, is emotional, and cries. Moehlmann saw Lambert take antipsychotic and psychotropic drugs. Moehlmann testified that her daughter's back pain impacts her mobility. Lambert lies on the floor to adjust her back. Moehlmann insists that Lambert's physical and mental difficulties have not resolved completely. Moehlmann has no medical report to confirm that Kelly Lambert is unfit to parent. Moehlmann admitted that Lambert might be a fit mother in the future. At trial, Moehlmann was unaware of Lambert's condition,

since Moehlmann had not seen her for more than one year and a half.

By the time of trial, Kelly Lambert had moved ten times since 2009. During the same four years, the Moehlmanns moved four times.

Kimberly Moehlmann conceded taking anti-depressants in the past. Moehlmann has suffered depression more than once.

Rod Moehlmann testified that he believes with one hundred percent certainty that Joseph Favazza molested Betty Sue. Kimberly Moehlmann testified that she believes Joe Favazza sexually abused Betty Sue, although she conceded her belief amounts only to suspicions.

At the conclusion of trial, the superior court granted Kimberly and Rod Moehlmann's petition for nonparental custody of Betty Sue. The court acknowledged RCW 26.10.100 that directs a court to consider the best interests of the child when awarding custody. The trial court, however, recognized the inapplicability of the best interests standard established in the statute and acknowledged the need for the Moehlmanns to prove that Kelly Lambert is either an unfit parent or placement with Lambert would result in actual detriment to the child's growth and development. The trial court concluded both that Kelly Lambert was an unfit parent and custody in Lambert would result in actual detriment to the growth and development of Betty Sue.

The trial court entered, in part, the following findings of fact:

19

2.7 . . . The respondent, KELLY LAMBERT, gave custody of the minor child to a neighbor and known felon. After giving custody of the child to a known felon, Ms. Lambert moved to Bremerton, WA to live with Mr. Favazza, a known sex offender.

Neither parent is a suitable custodian for the child, because:

The mother has abandoned the child and refused to perform parenting functions as listed in the Verbatim Report of Proceedings.

. . . .

2.9 . . . The following reasons exist for limiting visitation of Respondent KELLY LAMBERT:

Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions.

CP at 199.

Because the trial court incorporated its oral ruling into its findings of fact, we

quote some of the oral ruling:

Ms. Lambert suffers from mental health problems, namely depression, as evidenced by her discharge from the military, her sworn statement stating as such, her testimony at trial, and her history in being treated by two psychiatrists. Her mental health problems affect her ability to parent [Betty Sue] in that when she is at her lows, she lacks motivation and spends a great deal of time sleeping.

. . . .

In [Betty Sue's] first 32 months of life, Ms. Lambert moved from Utah to Olympia, from Olympia to Bremerton, from Bremerton to Utah, from Utah to Bremerton, from Bremerton to Spokane, from Spokane to Utah, from Utah to the Moehlmanns, from the Moehlmanns to Ms. Cozza's, and from Ms. Cozza's to Bremerton. The constant moving among cities and states is unstable, to say the least. Children need consistency and stability. In this account the Court did not recite Ms. Lambert's moves within the same city.

. . . .

Ms. Lambert has shown a willful and consistent failure to protect [Betty Sue's] welfare and safety. Ms. Lambert spontaneously entered a temporary order granting nonparental custody to Ms. Cozza. Not only is Ms. Cozza a five-time felon, her roommate, her boyfriend, Mr. Hoffman,

had just been convicted of harassment - threat to kill while Ms. Lambert was residing with Ms. Cozza. Ms. Lambert counters this as she did not know that either Ms. Cozza or Mr. Hoffman were felons. This is the issue. Ms. Lambert either knew or should have known both Ms. Cozza and Mr. Hoffman were felons prior to petitioning for temporary nonparental custody in Ms. Cozza's favor. Either way, Ms. Lambert disregarded [Betty Sue's] welfare and safety by leaving her alone with Ms. Cozza and Mr. Hoffman.

. . . .

In addition to Ms. Lambert's mental health issues, unstable lifestyle, and carelessly granting [Betty Sue's] custody to Ms. Cozza, Ms. Lambert has maintained an intimate relationship with Mr. Favazza, a person convicted of first-degree child molestation. During the course of their relationship, there have been allegations that [Betty Sue] may have been abused. At the time of trial, all of the allegations, with the exception of the pending allegation, was found to be unfounded by CPS. Even though CPS found these allegations to be unfounded, the Court can still consider the facts that led to the allegations being made.

In response to the allegations that [Betty Sue] may have been abused, Ms. Lambert simply confirms her commitment to Mr. Favazza. In fact, Ms. Lambert goes a step further and asserts that Mr. Favazza provides better care for [Betty Sue] than either Mr. or Ms. Moehlmann. Ms. Lambert is also convinced that Mr. Favazza is not guilty of first-degree child molestation; therefore, she does not have any concerns with Mr. Favazza being around either [Betty Sue] or [Sharon]. In light of the allegations of abuse and this pending nonparental custody action, Ms. Lambert still asserts her desire to wed Mr. Favazza.

In her decision-making process about Mr. Favazza's past, as well as her current trust of him, Ms. Lambert is not focusing on [Betty Sue's] safety and welfare. Regardless of Ms. Lambert's opinion as to Mr. Favazza's guilt or innocence, Ms. Lambert is not providing proper protection for her four-year-old daughter by minimizing Mr. Favazza's criminal past and believing that he would be a better caretaker than her own mother.

RP at 393-96. The trial court did not mention, either in its oral ruling or the written findings of fact or conclusions of law, the burden of proof it imposed on the grandparents' claims.

LAW AND ANALYSIS

Kelly Lambert contends the trial court employed the wrong legal standard when awarding third party custody to Kimberly and Rod Moehlmann. Lambert also contends insufficient evidence supports the trial court's finding that she is unfit to parent Betty Sue. In support of her twin arguments, Lambert maintains that the trial court failed to presume parental fitness, the trial court erroneously employed a best interest standard, the trial court failed to focus on her current fitness to parent, and the trial court relied on improper facts to support its finding of unfitness. Those unsuitable facts include her relationship with Joseph Favazza and her failure to exercise her visitation rights under the temporary custody order leading up to trial.

We assume the trial court employed the correct legal standard. We, however, conclude that the trial court utilized an erroneous burden of proof, or at least the trial court failed to expressly adopt the correct burden of proof. We also hold that, based on the sanctioned burden of proof, the evidence is insufficient to overcome Kelly Lambert's constitutional rights to parent Betty Sue. Stated differently, clear, cogent and convincing evidence does not support a required finding that Lambert is an unfit mother or that placement of Betty Sue with Lambert would cause actual detriment to the child's growth and development.

Nonparental custody cases often involve a young parent who struggles with an addiction or financial independence and gives one or more children to grandparents or

22

other relatives to temporarily raise. Eventually, the relatives seek formal legal custody. Although she occasionally lived in her mother and stepfather's home during which time the grandparents helped care for Betty Sue, Kelly Lambert never left Betty Sue permanently with Kimberly and Rod Moehlmann or consented to custody of Betty Sue by the Moehlmanns. When Betty Sue lived in the Moehlmanns' home, Lambert also resided in the dwelling. Lambert has a small, but adequate, income and she suffers no addiction. These factors boost Lambert's position on appeal.

The trial court's award of custody of Betty Sue to her grandparents over the objection of her mother prompts a preliminary discussion of constitutional rights. Parents have a fundamental right to autonomy in child rearing decisions. *In re Custody of Smith*, 137 Wn.2d 1, 13, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (Plurality Opinion). The United States Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without state interference. *Wisconsin v. Yoder*, 406 U.S. 205, 235-36, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). The liberty interest of parents may be the oldest of the fundamental liberty interests recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Freedom of personal choice in matters of family life is a fundamental liberty interest protected by

23

the due process clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972).

Despite many parents being untrained, unprepared, and inept in the art and science of raising a child, American law recognizes a natural right attached to the biological processes of siring and bearing a child. This right precedes law. The rights to conceive and to raise one's children are deemed "essential," "'basic civil rights of man.'" *Stanley v. Illinois*, 405 U.S. at 651 (1972) (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942)). The custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder. *Stanley v. Illinois*, 405 U.S. at 651.

Since the custody of a child is a fundamental, constitutional right, state interference is justified only if the State can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved. *Custody of Smith*, 137 Wn.2d at 15 (1998); *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). This standard is known as the strict scrutiny test. *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005).

The State may interfere and override a decision of a parent when the decision would harm the child. *Prince v. Massachusetts*, 321 U.S. 158, 165, 64 S. Ct. 438, 88 L.

Ed. 645 (1944); *Custody of Smith*, 137 Wn.2d at 15-16 (1998). Both the State's parens patriae power and police power provide the State with the authority to act to protect children lacking the guidance and protection of fit parents of their own. *Custody of Smith*, 137 at 16. Conversely, short of preventing harm to the child, the standard of "best interest of the child" is insufficient to serve as a compelling state interest overruling a parent's fundamental rights. *Custody of Smith*, 137 Wn.2d at 20. Only under "extraordinary circumstances" does there exist a compelling state interest that justifies interference with parental rights. *In re Custody of Shields*, 157 Wn.2d 126, 145, 136 P.3d 117 (2006) (quoting *In re the Marriage of Allen*, 28 Wn. App. 637, 649, 626 P.2d 16 (1981)). The State lacks authority to redistribute infants to provide each child with the "best family." *Custody of Smith*, 137 Wn.2d at 20. The State also lacks the power to make significant decisions concerning the custody of children merely because it could make a "better decision." *Custody of Smith*, 137 Wn.2d at 20.

In *Custody of Smith*, 137 Wn.2d 1 (1998), the Washington Supreme Court declared unconstitutional a statute that permitted third parties visitation rights to a child if visitation served the best interest of the child. The United States Supreme Court affirmed. *Troxel v. Granville*, 530 U.S. 57 (2000). In *In re Parentage of C.A.M.A.*, 154 Wn.2d 52 (2005), our state high court also held a grandparent visitation rights statute unconstitutional.

Arising from the clash between state authority and a parent's constitutional right is a standard that controls this appeal and all nonparental custody petition suits. The superior court may ultimately issue a custody order granting nonparental placement only if the court finds that the parent is unfit or placement with the parent would result in actual detriment to the child's growth and development. *In re Custody of B.M.H.*, 179 Wn.2d 224, 235, 315 P.3d 470 (2013); *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 344-45, 227 P.3d 1284 (2010); *Custody of Shields*, 157 Wn.2d at 142-43. This standard is necessary in order to adhere to the constitutional mandate that deference be accorded parents in child custody disputes with nonparents. *Custody of E.A.T.W.*, 168 Wn.2d at 344; *Custody of Shields*, 157 Wn.2d at 142.

With this constitutional background, we address Washington's nonparental custody petition act, upon which Kimberly and Rod Moehlmann initiated this action. In 1987, the Washington Legislature enacted the Parenting Act of 1987, chs. 26.09, 26.10 RCW, which redesigned RCW 26.09, the parenting chapter for marital dissolution actions. LAWS OF 1987 ch. 460. In turn, the legislature reenacted and continued the law relating to third party actions involving custody of minor children by adopting Chapter RCW 26.10 in order to distinguish third party actions from parental disputes concerning placement of children. RCW 26.10.010. The marital dissolution section of the Parenting Act replaced the term "custody" with "residential placement," to dispel the notion that children are chattel and property. The word custody remains in the nonparental custody

petition chapter.

Under RCW 26.10.030(1), a third party may file a nonparental custody petition "if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." Upon filing a petition, the third party must submit affidavits and obtain a court order of adequate cause before proceeding further with the action. RCW 26.10.032. In other words, a court adjudicating a nonparental custody petition must make a threshold determination that adequate cause justifies a hearing on the petition. RCW 26.10.032(2); *In re Custody of E.A.T.W.*, 168 Wn.2d at 342. Kimberly and Rod Moehlmann obtained an order of adequate cause. Kelly Lambert does not challenge the order of adequate cause, but the lack of a challenge to the initial order does not preclude her appealing the final order granting the nonparental custody petition.

One of the key provisions of the nonparental custody act is RCW 26.10.100. This section reads:

> The court shall determine custody in accordance with the best interest of the child.

Thus, the nonparental custody act incorporates the best interest standard declared unconstitutional in other settings.

In *Custody of Shields*, 157 Wn.2d 126 (2006), the Washington Supreme Court withheld a declaration that RCW 26.10.100 is unconstitutional, and instead inserted additional requirements into the nonparental custody petition setting. The court

recognized that the best interest standard fails to afford the natural parent required constitutional protections. But the statute is constitutional when adding the requirement that the parent be unfit or placement with the parent causes actual detriment to the child's growth and development. The Supreme Court reversed the trial court's grant of the child to a stepparent because, although the trial court referred to an actual detriment standard, the record reflected that the trial court applied a best interest standard. The requisite showing by the nonparent is substantial. *Custody of Shields*, 157 Wn.2d at 145.

Washington affords two alternative tests to the third party seeking child custody: (1) the natural parent is unfit, or (2) the parent causes actual detriment to the child's growth and development. One might equate a parent's actual detriment to a child's growth and development as being an unfit parent. In other words, one might question whether the second of the alternate tests is needed. A worthwhile distinction between the tests may focus on the characteristics and capabilities of the child. The second alternative may assume the child has some handicaps or special needs that even a fit parent cannot handle or fulfill.

The phrase "parental unfitness" employs vacuous words. Some Washington cases introduce other vocabulary to assist lower courts in resolving custody disputes, although the alternative terminology still affords minimal particularity in determining unfitness. In the context of a termination proceeding when the State must also show current unfitness, the State must prove that the parent's parenting deficiencies prevent the parent from

28

providing the child with "basic nurture, health, or safety" by clear, cogent, and convincing evidence. RCW 13.34.020; *In re Welfare of A.B.*, 181 Wn. App. 45, 58-59, 323 P.3d 1062 (2014). The Evergreen State Supreme Court has also defined parental unfitness as being unable to meet a child's basic needs, *In re Custody of B.M.H.*, 179 Wn.2d at 236 (2013), or lacking the necessary capacity for giving parental care. *In re Welfare of Aschauer*, 93 Wn.2d 689, 694, 611 P.2d 1245 (1980).

The expression "actual detriment to a child's growth and development" also lacks concreteness, but the Washington courts supply no alternative terminology. The State Supreme Court has observed that whether placement with a parent will result in actual detriment to a child's growth and development is a highly fact-specific inquiry, and precisely when actual detriment outweighs parental rights must be determined on a case-by-case basis. *Custody of Shields*, 157 Wn.2d at 143 (2006). When this heightened standard is properly applied, the requisite showing required by the nonparent is substantial and a nonparent will be able to meet this substantial standard in only "extraordinary circumstances." *Custody of Shields*, 157 Wn.2d at 145.

This appeal's trial court did not announce whether it based its decision on a preponderance of evidence or a clear, cogent, and convincing burden of proof. Employment of the correct burden of proof can be critical to the outcome of a nonparental custody petition. In *In re Custody of C.C.M.*, 149 Wn. App. 184, 202 P.3d 971 (2009), this court confronted the issue of the burden of proof. We noted that a third

party custody action places a parent's interest in the custody and care of a child at stake and thus the action is equivalent to a parental termination proceeding. A natural parent subject to a nonparental custody petition risks permanent deprivation of control over the supervision of the parent's child. Because of the severe consequences of an erroneous deprivation of a parent's custody rights, we held that a court must apply a more rigorous standard of proof in resolving third-party custody petitions. Thus, the petitioning party must prove his or her case by clear and convincing evidence. "This burden [of proof] is so substantial that, when properly applied, it will be met in only extraordinary circumstances." *Custody of C.C.M.*, 149 Wn. App. at 204 (internal quotation marks omitted).

Reviewing and comparing the facts in other nonparental custody appeals assists us in deciding whether the facts presented by Kimberly and Rod Moehlmann show by clear, cogent, and convincing evidence that Kelly Lambert was either an unfit parent or placement with Lambert would cause actual detriment to Betty Sue's growth and development. We start with decisions in which the court denied the third-party custody petition before moving to decisions where the court granted the petition.

In *In re Custody of B.M.H.*, 179 Wn.2d 224 (2013), a stepfather sought contact with his stepson through a de facto parentage petition. The Supreme Court held that the stepfather qualified as a de facto parent, but that he failed to meet "the high burden imposed on those seeking third party custody." 179 Wn.2d at 229. The stepfather

claimed the mother sought to prevent visitations, despite the stepfather having been the only father the child knew. He also claimed that the mother moved frequently in romantic relationships such that the child could not adjust to new men in his life. The stepfather averred that the mother's choices were "detrimental" to the son. *In re Custody of B.M.H.*, 179 Wn.2d at 238. Our high court noted that, in each case when appellate courts upheld a finding of actual detriment to the child, the child "had significant special needs" that a parent could not fulfill. *In re Custody of B.M.H.*, 179 Wn.2d at 239.

In *Custody of C.C.M.*, 149 Wn. App. 184 (2009), this court affirmed the trial court's denial of the grandparents' petition for custody and award of placement to the father. The child lived with the grandparents since her birth and until the filing of the petition. The record showed no visits by the father until after the filing of the petition.

In *Custody of Shields*, 157 Wn.2d 126 (2006), the lower court awarded third party custody to a stepmother over the biological mother's objection. The trial court emphasized the child's desire to stay in the stepmother's home, the child's longstanding relationship with the stepmother, siblings, and extended family in Washington. Our Supreme Court reversed and remanded for a new hearing because none of these considerations pertained to the biological mother's fitness and contravened the presumption that she will act in her child's best interests.

Cases in which the court granted a third party petition illustrate what the case on appeal is not. *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981) was decided

before the 1987 act and based on the assumption that a stepmother was a parent of a child for purposes of a child custody decision during a marriage dissolution. The assumption that a stepparent is a parent for purposes of child placement no longer rings true. Nevertheless, the decision illustrates an instance when a nonparental custody petition might be granted. Joshua Edward Allen was born profoundly deaf. After his birth and when Joshua's father Joe held custody of the boy, Joe married Jeannie, who had three children older than Joshua. The four children resided with Jeannie and Joe. During the marriage, Jeannie engaged in extraordinary efforts to accommodate Joshua's disability, including learning sign language and teaching sign language to her three other children. All four used sign language as fluently as ordinary speech and communicated only in sign language in the presence of Joshua. Joe, the father, had minimal sign language capability. Joe was fatalistic toward Joshua's disability, while Jeannie believed in Joshua's unlimited development. This court affirmed the trial court's award to Jeannie of custody of Joshua. In affirming, we noted that, despite the custody statute referring to the best interest of the child, there must be a showing of actual detriment to the child. We confirmed the trial court because of the singular and usual circumstances of the case.

*In re Parentage of J.A.B.*, 146 Wn. App. 417, 191 P.3d 71 (2008) was a suit for establishment of de facto parentage status rather than a nonparental custody petition. This court affirmed the granting of parentage to a stepfather over the objection of the mother. In so ruling, we agreed with the trial court that the mother was an unfit parent.

The mother became delusional after being imbued with frenetic energy and speaking in rhyme. Eventually she grew mute and communicated only through written notes. Doctors diagnosed the mother with bipolar affective disorder and prescribed mood stabilizing and antipsychotic medication. The mother disliked the side effects of her medication and ceased taking them. She became paranoid and began speaking in rhyme again. Instead of writing poems, she threatened suicide. In passing, this court mentioned that the third-party custody statute aims at protecting children without fit parents or children whose "extraordinary circumstances," render placement with a fit parent detrimental to the child's growth and development. *In re Parentage of J.A.B.*, 146 Wn. App. at 426.

In *In re Custody of R.R.B.*, 108 Wn. App. 602, 31 P.3d 1212 (2001), the court granted a nonparental custody petition when a suicidal child required extensive therapy and stability at a level the parents could not provide. The parents may have abused the child by beatings with a leather belt, a wooden paddle, and a wire hanger. Doctors diagnosed the girl as suffering from bipolar disorder and post-traumatic stress disorder. In *In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989), this court reversed the superior court and granted the petition when a child, who had been physically and sexually abused, required extensive therapy and stability at a level the parent could not provide.

In *In re Interest of Mahaney*, 146 Wn.2d 878, 51 P.3d 776 (2001), the trial court

33

granted the grandmother her petition under RCW 26.10. The Supreme Court affirmed the award of residential custody to the grandparent but remanded for proceedings necessary to satisfy the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 et. seg. The children had lived with their grandmother for ten years. The mother abused alcohol and illegal drugs that the trial court found impacted her parenting functions. The mother admitted to observing her brother engaging in inappropriate sexual games with the children. The daughter claimed her mother also sexually abused her.

The Moehlmanns argue that a decision overturning the trial court's decision would conflict with principles of deference during appellate review. This court reviews a trial court's findings of fact to determine whether they are supported by substantial evidence. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). A trial court's custody disposition will not be disturbed on appeal absent a manifest abuse of discretion. *Schuster v. Schuster*, 90 Wn.2d 626, 632, 585 P.2d 130 (1978).

In the face of these principles, we still reverse. In the context of a nonparental custody petition, Washington appellate courts have not shied from reversing trial courts when evidence is insufficient. The record does not show the trial court applied the correct burden of proof to Kimberly and Rod Moehlmann's claims. The facts fail to show Kelly Lambert is currently an unfit parent and fall short of establishing that placement with Lambert would result in detriment to Betty Sue's growth and development. No independent or expert testimony shows any detriment to Betty Sue.

Much of the evidence concerned Lambert's past, not current condition. This case is not the extraordinary case that merits denying a parent's constitutional right to the care and companionship of her daughter.

The trial court found Kelly Lambert unfit to parent or her parenting likely to harm Betty Sue's growth and development because of Lambert's mental health issues, her lifestyle of instability, her careless granting of Betty Sue to Jeri Ann Cozza, and her consistent failure to protect Betty Sue from a convicted sex offender. The trial court also faulted Kelly Lambert with not taking advantage of the visitation afforded under the temporary orders.

The scant evidence in the record shows that Kelly Lambert principally struggled with her mental health in 2007. The only information concerning Lambert's mental health since 2007 shows Lambert to consistently participate in counseling. No counselor or psychologist testified to the severity of Lambert's current mental health issues or how those issues might impact her parenting of Betty Sue. Kelly Lambert's earlier mental health illness did not reach the difficulties encountered by parents, from whom children were taken, in reported decisions. Any mental health problems predated Lambert becoming a parent in 2009.

Kimberly and Rod Moehlmann testified to Lambert being lazy and quick to leave Betty Sue in others' care. The trial court found that Lambert lacks motivation and spends a great deal of time sleeping. These characteristics alone do not amount to a mental

health defect that renders Lambert unfit. A parent is permitted to leave a child in the care of another and not have the child's custody granted to a third party. In short, there is no evidence of any mental health issues that interfere with Kelly Lambert's ability to parent Betty Sue.

Kelly Lambert should not be imputed with mental illnesses suffered in past years. In a marital dissolution custody dispute, this court noted that the test for fitness of custody is the present condition of the mother and not any future or past conduct. *In re Marriage of Nordby*, 41 Wn. App. 531, 534, 705 P.2d 277 (1985). This same principle should apply in a third-party custody case.

The trial court also supported its finding of unfitness by stressing Kelly Lambert's unstable lifestyle. Lambert moved frequently prior to the initiation of these proceedings. Military families often move frequently and hopefully do so without fear of losing their children due to an unstable lifestyle. Although the moves were in the same city, Ira and George Gershwin moved twenty-one times as children. No social worker, guardian ad litem, parenting expert, or any other person testified to how Kelly Lambert's lifestyle interfered with her ability to parent, or might cause Betty Sue actual detriment. No facts showed that the moves impacted Betty Sue's growth and development.

Even if the Moehlmanns presented evidence of the many moves impacting the development of Betty Sue, the relevance of the evidence to Kelly Lambert's current parental fitness at the time of trial would be questionable. For the two years preceding

trial, Lambert lived in two residences within Bremerton. When and if a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child. *In re Parentage of J.A.B.*, 146 Wn. App. at 426 (2008). In other words, Lambert's current stability controls. The test for fitness of custody is the present condition of the mother and not any future or past conduct. *In re Marriage of Nordby*, 41 Wn. App. at 534 (1985). In the last two years, Lambert moved from one residence to the other because she was pregnant and anxious about the presence of lead paint. This move illustrated her concern for her children rather than a lack of stability.

The trial court also underlined Kelly Lambert's granting of custody of Betty Sue to Jeri Ann Cozza. The trial court voiced concern over Lambert's not knowing Cozza's criminal history or the criminal history of Cozza's boyfriend. Nevertheless, no one investigated or testified to how Cozza cared for Betty Sue. No evidence addressed whether Cozza's home was safe and clean. No one presented any percipient testimony of Cozza's or her boyfriend's criminal history actually harming Betty Sue. Washington does not remove children from felons on the basis that the custodian has a criminal history. The only evidence regarding Jeri Cozza's interaction with Betty Sue comes from a medical record. In the record, the physician described Cozza as "extremely good" with Betty Sue and wrote, "[Cozza] is doing a good job of caring for [Betty Sue] and demonstrates affection and appropriate actions." CP at 75, 78.

The trial court also supported its finding of unfitness by mentioning Kelly

Lambert's failure to exercise the visitations afforded her under the temporary orders preceding trial. Nevertheless, the fact that a parent does not have physical custody of the child, standing alone, does not show that the parent is unfit or that actual detriment would result from placing the child with the parent. *In re Custody of E.A.T.W.*, 168 Wn.2d at 344-45 (2010). In *Custody of C.C.M.*, 149 Wn. App. 184 (2009), this court affirmed the trial court's denial of the grandparents' petition for custody and award of placement to the father, despite the father visiting the child only once before filing of the petition.

The pending action was not a dependency action under chapter 13.34 RCW, in which visitation was ordered by the court as a means of correcting parental defects. As her relationship with her parents became increasingly strained, Kelly Lambert chose not to exercise visitation. Lambert lived in Bremerton and was pregnant for some of the time. She expected Kimberly and Rod Moehlmann to seek an order removing the new child from her if the Moehlmanns knew of her pregnancy. Lambert provided the daily care for Betty Sue for three years before the Moehlmanns filed their petition and appears ready to assume parental responsibilities again. To repeat, when a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child. *Parentage of J.A.B.*, 146 Wn. App. at 426. The parent awarded temporary residential placement of the child should not be given any advantage when the permanent parenting plan is entered. *In re Marriage of Kovacs*, 121 Wn.2d 795, 808, 854 P.2d 629 (1993).

Kelly Lambert pled in her 2012 nonparental custody petition to appoint Jeri Ann Cozza that she was unfit to parent. Assuming we take this pleading at face value, the confession did not render Lambert unfit at the February 2014 trial.

The presence of Joe Favazza loomed as the principal trepidation of Kimberly and Rod Moehlmann. The trial court underscored Kelly Lambert's failure to protect Betty Sue from a convicted sex offender. This court concurs with the trial court's worry about Lambert's relationship with Joe Favazza, Lambert's denial of the validity of Favazza's conviction, and the lack of concern of mothering another child with Favazza. Sixteen years ago Joseph Favazza was convicted of first degree child molestation. Betty Sue exhibited concerning behaviors, such as humping stuffed animals and night terrors.

Despite this court's apprehension, no evidence connects Betty Sue's behaviors to Favazza. No one testified to observing Favazza behave inappropriately around Betty Sue. No physician found physical signs of trauma or abuse. No one testified to the likelihood of Favazza reoffending nine years after his release. CPS conducted the only investigation and found the Moehlmanns' allegation of molestation unfounded. CPS approved Favazza being with his and Lambert's daughter, Sharon.

Betty Sue first exhibited the sexual behavior after she and Kelly Lambert returned to Washington in early 2012, after having spent the previous year in Utah with Jeffrey Pollard. No expert, or any of the five lay witnesses, testified to the importance or unimportance of this timing. Kimberly and Rod Moehlmann repeatedly and vociferously

voiced their anxiety regarding Joseph Favazza and their granddaughter. These concerns are commendable and understandable, but they are not evidence.

Even if specific facts or testimony supported the Moehlmanns' concern that Joseph Favazza presents a risk of actual detriment or harm to Betty Sue, finding Kelly Lambert unfit as a parent is not narrowly tailored to serve the State's interest in protecting Betty Sue. The scant record shows that once the trial court entered a temporary protective order against Favazza in favor of Betty Sue, Favazza and Lambert respected that court order.

A decision of relevance is *In re Dependency of M.S.D.*, 144 Wn. App. 468, 182 P.3d 978 (2008). The trial court ordered a dependency based on the State's concern that the mother failed to protect her daughter from her boyfriend, Seth Poirer. Poirer had a ten-year-old conviction for assault and criminal mistreatment of his two-month-old baby. The mother's brother also reported to police that Poirer sexually abused M.S.D. Nevertheless, a physician, who examined M.S.D., ruled out sexual abuse. This court reversed the dependency, even after recognizing the appellate principle that this court must affirm the trial court if substantial evidence supports the findings of fact. This court observed that a poor choice of a partner is not a reason for the State to interfere in the life of a family.

Kelly Lambert currently parents another child, Sharon. CPS investigated the home environment of Lambert for purposes of parenting Sharon. CPS returned Sharon to

the home. Sharon is younger than Betty Sue and needs more care than Betty Sue. An anomaly would follow if the State concluded that Lambert can parent a two-year old, but a five-year old is taken from Lambert.

Kimberly Moehlmann claimed that Kelly Lambert allowed Betty Sue to lapse in immunizations. The medical records both confirm and contradict this claim. Lambert testified she kept Betty Sue current on immunizations. No physician resolved the conflicting records. Kimberly Moehlmann testified that Betty Sue needed speech therapy. The evidence shows that, although Moehlmann assisted with ferrying Betty Sue to therapy, Kelly Lambert initially arranged for the therapy.

No evidence supports a conclusion that Kelly Lambert's care for Betty Sue stunted the infant's growth and development. No evidence supports Betty Sue currently having special needs to which Lambert is unable to attend. This appeal's facts do not constitute extraordinary circumstances warranting breaching Kelly Lambert's fundamental right to parent her child.

Kelly Lambert filed a reply brief captioned "Appellant's Reply Brief and Renewed Motion to Strike." In the brief, Lambert complained of factual inaccuracies in the Moehlmanns' respondent brief. Because the motion violates the strictures of Title 17 of the Rules of Appellate Procedure, we refuse to address it.

## CONCLUSION

We reverse the granting of Kimberly and Rod Moehlmann's nonparental custody

No. 32441-9-III
*In re Custody of ALD*

petition.  We dismiss the petition with prejudice.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

42

No. 32441-9-III

BROWN, J. (dissenting) — Trial judges in third party custody cases, like this one concerning A.L.D., resolve agonizing competing facts after trial and apply the relevant law to the facts found. Trial judges exclusively decide close, difficult questions of evidence weight and witness credibility because they see the evidence presented and see the witnesses testify. Trial judges should not be lectured on moral imperatives and need not be reminded of how excruciating this process is when acting under law as impartial, secular decision makers.

Appellate judges on review do not determine who should have custody. We do not decide anew evidence weight and witness credibility. *In re Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973). Our role here is to decide if sufficient evidence supports the trial court's findings of fact, and if those findings support the conclusions of law; this is true even if we would have decided the facts differently, or would prefer to believe one witness over another, or would prefer a different result. *Id.* at 740.

In my view, sufficient evidence supports the trial court's findings of fact; the findings of fact support its conclusions of law. Generally, the trial court found Ms.

Lambert (1) chose to infrequently visit A.L.D., (2) moved frequently causing inconsistency and instability, (3) was impaired in her ability to parent by mental health problems, (4) willfully and consistently failed to protect A.L.D., (5) disregarded A.L.D.'s welfare by carelessly abandoning A.L.D. with Ms. Cozza and Mr. Hoffman, and (6) endangered A.L.D.'s safety by denying Mr. Favazza's child molestation conviction. The trial court specified it reconsidered the factual allegations concerning Mr. Favazza that were first considered by CPS. Because I would affirm, I respectfully dissent.

Brown, J.
_____
Brown, J.