**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>D.J.P., C.-S.J.P., J.J.P., A.J.P., N.V.P., and T.J.C.J.P.,<br><br>Minor children. | No. 83166-6-I<br>(consolidated with<br>Nos. 83167-4-I, 83168-2-I,<br>83169-1-I, 83190-9-I, 83191-7-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — The trial court terminated J.P.'s parental rights to his six children following a seven day trial. J.P. appeals. At issue is whether the Department of Children, Youth, and Families (Department) satisfied its burden under several provisions of RCW 13.34.180(1), whether several challenged findings of fact (FFs) are supported by substantial evidence, and whether the trial court abused its discretion in qualifying an interpreter of J.P.'s language, Kosraean. We affirm.

I

A

J.P. is the biological father of D.J.P., C.-S.J.P., J.J.P., A.J.P., N.V.P., and T.J.C.J.P. The family has a history of child protective services (CPS) involvement and documented domestic violence, predominantly directed at T.J.C.J.P., J.J.P., and K.P., the children's biological mother. The family experienced two dependencies: the first was filed in 2010 and the second in 2017. The allegations in the dependencies included domestic violence, alcohol use, and neglect. In

November 2010, Kent police arrested J.P. for fourth degree assault, domestic violence. J.P. was convicted of attempted assault of K.P. On May 4, 2011, a court entered an agreed order of dependency and disposition as to J.P. and found A.J.P., N.V.P., and T.J.C.J.P., all of J.P.'s children at the time, dependent. This dependency was dismissed.[1] In 2017, the Department removed all six children from J.P.'s care.

At a shelter care hearing on December 21, 2017, a court found it was contrary to the welfare of the children to remain or return home and there was reasonable cause to believe the children had no parent to provide supervision or care for them. The court granted J.P. supervised visitation twice per week for two hours at a minimum. On April 23, 2018, the court entered an agreed order of dependency as to J.P. for all six children. The court ordered J.P. to complete random urinalysis once per week for 90 days, adding the Department may request an additional random urinalysis up to six times per month upon suspicion of use and a drug/alcohol evaluation, and to follow treatment recommendations. The court ordered J.P. to complete a domestic violence batterer's assessment and a parenting assessment, and to follow all recommendations resulting from both.

In July 2018, J.P. began a drug and alcohol assessment, the first service in which J.P. participated. In October 2018, J.P. pleaded guilty to two counts of domestic violence assault against T.J.C.J.P. and J.J.P. The court in the assault case issued a no-contact order protecting T.J.C.J.P. and J.J.P., which remained in

---

[1] Although it was not admitted into evidence in the dependency trial under review, the record includes an order dated September 14, 2011 dismissing the earlier dependency.

effect until May 2022.  J.P. participated in inpatient treatment for his substance use at Sea Mar in 2018 and completed a substance use assessment at Social Treatment Opportunity Programs (STOP) in 2019.  On October 23, 2019, J.P. began an intensive outpatient program.  J.P. completed a parenting assessment and started urinalysis testing in 2019.  J.P. visited and communicated with his children for the last time in 2019.  At the time of trial, J.P. had been clean and sober since July 15, 2019.  J.P. completed a domestic violence evaluation at STOP in March 2020 and, at some point, completed STOP's domestic violence program.

On June 3, 2020, the court granted the court appointed special advocate's (CASA) motion to suspend J.P.'s visitation, finding J.P. had not completed domestic violence services required by a court order and the children had been out-of-home for 30 months, were currently in stable and loving homes, and had regular and safe contact with one another.

In July 2020, J.P. completed a psychosocial parenting assessment with Carmela Washington-Harvey, PhD.  Dr. Washington-Harvey recommended in her report services including family/reconciliation therapy, trauma focused therapy for J.P. that focuses on childhood trauma, age appropriate parent education, and the completion of substance abuse and domestic violence programs.  J.P. did not complete family/reconciliation therapy or trauma focused therapy.

B

On August 14, 2020, the Department filed a petition for termination of J.P.'s parent-child relationship with all six children.[2] The termination trial lasted seven days, from July 20, 2021 through July 29, 2021.

1

At the time of trial, the children lived in two separate homes, but were provided the opportunity to see one another in visits at least twice a month. All six siblings "enjoy their time together," and CASA Jeanne Dembeck characterized the visits as "a highlight of their month." When speaking about all the children, Dembeck noted the settings they are being raised in are the most positive settings for them to continue to be raised in, and it was best for all of the children to be adopted.

The trial court's relevant unchallenged findings of fact[3] and trial testimony as to each individual child are summarized as follows:

T.J.C.J.P.

T.J.C.J.P. was 14 years old. Dembeck testified T.J.C.J.P. did not want to talk about J.P. and rarely talked about him. Dembeck reported T.J.C.J.P. was fearful of J.P. Dembeck recounted an instance when T.J.C.J.P. told her that he wrestled in 2019 and had to quit because T.J.C.J.P. could not "stand having the holds on him that wrestling requires; like, totally freaked him out." T.J.C.J.P. attributed this reaction to J.P. who used to hold him down. T.J.C.J.P. indicated to

---

[2] K.P.'s rights as to the children had been terminated before trial.
[3] Unchallenged findings of fact are accepted as true on appeal. In re Det. of L.S., 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

Dembeck that he is not ready in any way to engage in any kind of therapy with J.P. Dembeck testified T.J.C.J.P. repeatedly told her he does not want to see J.P. until he's a "full-grown man" to be able to defend himself against J.P.

T.J.C.J.P.'s therapist Aldon Schwimmer testified T.J.C.J.P. reported J.P. is abusive and hit people. Schwimmer testified T.J.C.J.P. looked forward to being in a stable and loving home permanently. T.J.C.J.P. reported feeling "nurtured and well-loved and cared for" by his foster parents in their home. Schwimmer denied any indication during T.J.C.J.P.'s therapy sessions that T.J.C.J.P. is emotionally ready to have contact with J.P. Schwimmer believed it still was difficult for T.J.C.J.P. to address his trauma.

### N.V.P.

N.V.P. was 12 years old. Dembeck testified N.V.P. talked a lot "in the beginning" about J.P., things she had seen him do, and how they scared her. Dembeck reported N.V.P. is not particularly open with her about discussing J.P. While N.V.P. would talk about J.P., she preferred not to. N.V.P. recalled one instance to Dembeck where A.J.P. did something that made J.P. angry, and A.J.P. ran and hid under a bed in response. J.P. told N.V.P. to grab A.J.P. and drag her out by her hair if needed, which upset N.V.P. The last time N.V.P. recounted an incident to Dembeck was three to four months before trial. Dembeck testified N.V.P. said she did not want to see J.P.

### A.J.P.

A.J.P. was 10 years old. Dembeck testified when first attempting to speak with A.J.P. about J.P., A.J.P. would cry nonstop for about 45 minutes and then

5

went to her foster father, because A.J.P. said she could not talk about J.P. This went on for a few months. By the time of the termination trial, Dembeck reported A.J.P. as being "good" and very bonded to her foster parents, especially her foster mother. Dembeck described one instance A.J.P. reported when J.P. was going to visit his three youngest children, and A.J.P. said through tears she would go on the visit to protect them from J.P. Dembeck testified A.J.P. expressed on many occasions that she does not wish to see J.P.

A.J.P.'s mental health counselor Pepper Snider testified that when she first started working with A.J.P., A.J.P. "presented as worried." Snider explained A.J.P. worried about the uncertainty and possible change of her living arrangement. A.J.P. expressed concern to Snider about the termination trial because A.J.P. worried she would have to return to living with J.P.

### J.J.P.

J.J.P. was 9 years old. When asked whether J.J.P. ever brought up J.P., Dembeck testified J.J.P. is "very angry" and has been for "probably the last six or seven months." In contrast to some of her siblings, J.J.P. is always angry instead of sad when discussing J.P. Dembeck reported J.J.P. said she does not want to be with J.P. or ever see him again. Dembeck testified J.J.P. expressed she wants to be adopted and thinks J.P. should "just allow her to be adopted."

### C.-S.J.P.

C.-S.J.P. was 8 years old. Dembeck reported C.-S.J.P. had a lot of anger issues they are trying to work out and still has frequent nightmares. Dembeck

testified some of those nightmares come from the "Chucky" movies[4] J.P. and C.-S.J.P. watched that scared C.-S.J.P.  C.-S.J.P. expressed a desire to be adopted.

C.-S.J.P.'s youth therapist Kathy Opie testified C.-S.J.P. presents with recurrent nightmares and tantrums.  Opie noted C.-S.J.P. has anger problems, anxiety, low self-esteem, guilt, shame, fear, attachment issues, and difficulty adjusting.  As Opie began working with C.-S.J.P., C.-S.J.P. reported many instances of past abuse and trauma.  Opie testified she had to make four separate CPS calls based on C.-S.J.P.'s reports of past trauma abuse, noting those actions alone constituted cause to diagnose C.-S.J.P. with posttraumatic stress disorder.  C.-S.J.P. reported to Opie that she had been repeatedly exposed directly and indirectly to physical abuse, emotional abuse, and domestic violence.

Opie testified about several specific incidents of trauma C.-S.J.P. reported to her.  C.-S.J.P. said, " 'My father put my head in a toilet . . . and made my mom's eye purple.' "  C.-S.J.P. reported J.P. hit " 'us a lot' " and " 'the police knew about it.' "  Opie testified C.-S.J.P. told her she had to watch "Chucky" movies with her family, and C.-S.J.P. has recurring nightmares "from this imagery."  During a family therapy session with her foster mom, Opie testified C.-S.J.P. broke down in tears and said she was afraid of J.P. before sobbing uncontrollably.

---

[4] The "Chucky" movies are a series of horror films, originally franchised under the name of Child's Play before incorporating "Chucky" into the titles of various sequels.  See, e.g., CHILD'S PLAY (Metro-Goldwyn-Mayer/United Artists 1988); BRIDE OF CHUCKY (Universal Pictures 1998).

D.J.P.

D.J.P. was 5 years old. Dembeck testified D.J.P. came into care when she was just over one year old and, at the time of trial, was anticipated to be starting kindergarten in fall 2021.[5]

2

The Department assigned social worker Marissa McGee to J.P. and his family in July 2018. McGee testified her responsibilities included reminding parents of their obligations, usually in the form of a "service letter." She stated a service letter lists a parent's obligations based on a court order. McGee referred J.P. to court-ordered services and urinalysis testing in September 2018. McGee testified she accommodated J.P.'s vision issues by enlarging pictures and text to assist J.P. in seeing them better. McGee provided translated copies of court documents to J.P. McGee testified Dr. Washington-Harvey recommended J.P. complete trauma therapy, focusing on childhood trauma. McGee called several providers, including Sea Mar, Valley Cities, Sound Mental Health, Northwest Family Life, and Catholic Community Services, to find an available trauma therapy program for J.P. McGee referred J.P. to "Consejo" on February 28, 2021 for trauma therapy. McGee testified J.P. did not complete trauma therapy:

> Q Did Dr. Washington-Harvey also recommend [J.P.] complete trauma therapy, focusing on childhood trauma?
> A Yes.
> Q Did [J.P.] complete that service?
> A No.

---

[5] In her testimony, Dembeck testified "I don't believe [D.J.P.] remembers her dad," and the trial court sustained an objection to this statement based on foundation and nonresponsiveness.

Q Did you refer that service?
A Yes.
Q And who did you refer [J.P.] to complete that service with?
A Consejo.

McGee testified that based on Consejo's representations, J.P. could start or complete the service on his own. McGee testified she could not find an available program earlier because of difficulties in finding a provider who would offer trauma therapy without the children present.

McGee reported she referred J.P. to a reconciliation therapy service around February 2021 also at Consejo. McGee searched for family therapy or family reconciliation therapy programs through other providers, including Valley Cities, Sea Mar, Sound Mental Health, and Catholic Community Services. McGee testified she expected J.P. to take both family therapy and trauma-focused therapy at Consejo consecutively.

McGee testified J.P. did not complete either trauma therapy or reconciliation therapy. McGee noted she asked J.P. to complete trauma therapy several times but he did not want to do the service because "if his children weren't going to participate, then he did not want to do that service." McGee sent service letters to J.P. in April 2021, May 2021, and June 2021. According to McGee, J.P. also failed to complete reconciliation therapy because his children were not going to be involved. J.P. informed McGee seeing his children "was the only reason why he wanted to take the therapy."

C

On August 3, 2021, the trial court issued its oral findings, and on August 13, 2021, the court filed its "Hearings, Findings, and Order Regarding Termination of

9

Parent-Child Relationship of [J.P.]." The court terminated J.P.'s parental rights for all six children. J.P. appeals.

During this appeal's pendency, the Department conceded there was an inadequate record at trial to establish that Kosraean interpreter Driskell Jack met the RCW 2.43.030(2) requirements and requested this case be remanded for a reference hearing under RAP 9.11. On June 1, 2022, a court commissioner remanded for that limited purpose and stayed the appeal during the remand. The trial court held the reference hearing on August 26, 2022.

II

J.P. argues the trial court erred in appointing Jack without ensuring he was an appropriately qualified interpreter. J.P. concedes that there was good cause not to use a certified interpreter because there are not certified interpreters of Kosraean but argues the trial court failed to make the findings necessary to ensure Jack was otherwise qualified and competent. Based on the supplemental information provided during the reference hearing, we disagree.

Chapter 2.43 RCW details statutory requirements for interpreters for non-English-speaking persons. If the trial court finds good cause for using an interpreter who is not certified, the court must make a preliminary determination, on the basis of testimony or stated needs of the non-English person, that the proposed interpreter is able to interpret accurately all communications to and from such person in that particular proceeding. RCW 2.43.030(2). The trial court must satisfy itself on the record that the proposed interpreter "(a) Is capable of communicating effectively with the court or agency and the person for whom the

10

interpreter would interpret; and (b) Has read, understands, and will abide by the code of ethics for language interpreters established by court rules." RCW 2.43.030(2). Appellate courts review the appointment of an interpreter for an abuse of discretion. Mason v. Mason, 19 Wn. App. 2d 803, 823, 497 P.3d 431 (2021), rev. denied, 199 Wn.2d 1005, 506 P.3d 638 (2022).

A

At the start of trial, in response to the court's inquiry, Jack stated that Kosraean is not a certifiable language.[6] The trial court asked that Jack "solemnly swear that you will faithfully to your best abilities translate Kosraean?" and "will faithfully and to your best abilities translate from Kosraean to English and English to Kosraean?" Jack answered both inquiries affirmatively. None of the parties raised any issues with Jack serving as interpreter (then or at any time during trial), but the court did not inquire further into Jack's qualifications to do so.

During J.P.'s testimony, the following exchange took place:

Q How many times have you hit—how many times have you hit [N.V.P.]?
A Yeah. If I have—I don't count, but if I have to spank them, I cannot tell you the exact time or how many.
    [Department]: Sorry, Mr. Interpreter, you cut out in the middle. Can you repeat that answer?
A I cannot—I cannot count the number of times when I—when I spank.

Later during J.P.'s testimony, the following exchange took place:

---

[6] Under RCW 2.43.030, a court may appoint an interpreter who is not certified for "good cause," which includes, relevant here, that "[t]he current list of certified interpreters maintained by the administrative office of the courts does not include an interpreter certified in the language spoken by the non-English-speaking person." RCW 2.43.030(1)(b)(ii).

11

Q So, if I can clarify you would spank your children, all of them, every
day?
A Not every day, not every time.
Q Was it most days?
A I don't have to say that most days.
    [Department]: I'm sorry, Mr. Interpreter, could you repeat
that? A I'm not saying that I hit the kids on most days.

During his cross-examination by the CASA, J.P. objected to acknowledging that a court order required him to complete a drug and alcohol evaluation and follow treatment recommendations unless Jack read him the sections to which the CASA was referring.

At least twice during the proceedings, J.P. and his attorney sought Jack's assistance to interpret attorney-client consultations. First, J.P. objected to testimony during his cross-examination when asked about whether he sent gifts to all the children in 2019 or 2020 "[o]ther than [J.J.P.] and T.J.[C.J.P.]" The trial court placed J.P., his attorney, and Jack in a Zoom[7] breakout room where J.P.'s attorney gave him the option to wait to speak to a criminal lawyer, and J.P. invoked his Fifth Amendment privilege as it related to any discussions regarding J.J.P. and T.J.C.J.P. Second, J.P.'s attorney requested time to speak with J.P. and Jack in a breakout room to discuss whether J.P. should be called in his case in chief. The trial court granted this request. At no time during either of these instances, or at any other time, did J.P. raise any issues with Jack's interpretation.

At one point during J.P.'s direct examination, Jack had difficulty hearing J.P.'s response to a question due to a noise interference. Jack stated, "I cannot

---

[7] "Zoom" is a cloud-based, peer-to-peer videoconferencing software platform that is used for teleconferencing, telecommuting, distance education, and social relations.

pretend to translate what is said after [J.J.P.'s name]. I will be doing a disservice. I want to be very clear what he's saying so I can interpret it. Still not clear."

Following this court's limited remand, the trial court held a reference hearing to inquire further into Jack's qualifications and interpreting services provided at trial. Testimony at the reference hearing showed Jack is a native Kosraean speaker who learned English in Micronesia while in school. Jack had been interpreting in Washington since 2003. From 2003 through the 2022 reference hearing, Jack estimated he interpreted over a hundred cases in Washington. For this case, Jack estimated he interpreted approximately 10 proceedings. The trial court asked whether Jack had any difficulty in interpreting for J.P. at any of the proceedings. Jack responded, "Everything that was translated—usually, there is this thing that you understand it, because with translation, meaning could be lost, but this is the thing. We always explain it. Explain to the proximation of what was being said, because English and Kosraean are not the same language." Jack noted, "I translate to the best of my ability and ask if it's being understood." Jack testified at the reference hearing that he could understand J.P. and J.P. could understand him as well.

When asked whether he is familiar with the GR 11.2 interpreter code of ethics, Jack replied, "I'm not sure about—what 11.2 is saying, but I went to Seattle Municipal Court. That had ethic class there. I took a RCW course at Highline College and a few other classes, Introduction to Criminal Justice at Highline College." Jack understood as an interpreter, everything must be interpreted, even if it seems nonresponsive, obscene, rambling, or incoherent. Jack also understood

that interpreters are prohibited from knowingly accepting an assignment beyond their skill level.

When asked whether he had read the manual "The Code of Ethics for Interpreters," Jack testified he read the "one provided at the Seattle Municipal Court and the courts that I interpret for." Jack recalled a pamphlet he had read 10 years prior about how interpreters are supposed to interpret from one language to another and the code of guidelines. Jack's one day class consisted of a demonstration, and the instructor distributed written materials. When a person Jack interprets for says they do not understand a question, Jack either repeats the question or finds out what was not clear about it. Jack reported if a client had some confusion and Jack felt it necessary to do so, many times he would ask the court or attorney to repeat the question or statement. The trial court found Jack complied with the GR 11.2 requirements and possessed the skills necessary to interpret in Washington.

B

The Department argues J.P. failed to object to Jack serving as the termination trial interpreter and accordingly forfeited his right to challenge Jack's appointment. We decline to resolve this claim of error on the basis of waiver.

In In re Dependency of J.E.D.A., Jr., 2 Wn. App. 2d 764, 768-69, 413 P.3d 574 (2018), the trial court erred in dismissing a party from a dependency because the trial court "did not satisfy itself on the record as to the interpreter's qualifications." The State conceded error "[e]ven though [the party] did not object at the hearing to the interpreter's qualifications." Id. at 769. In State v. Aljaffar,

198 Wn. App. 75, 82-83, 392 P.3d 1070 (2017), in reference to the criminal defendant's Sixth Amendment and state constitutional rights, we stated, "Non-English speakers involved in court proceedings are entitled to the assistance of a court-appointed interpreter." The purpose of chapter 2.43 RCW is to uphold the constitutional rights of non-English-speaking persons. State v. Gonzales-Morales, 138 Wn.2d 374, 381, 979 P.2d 826 (1999).

The parties have not cited and we have found no Washington case law clearly addressing the requirement of an objection in the trial court to preserve a challenge to an interpreter's lacking minimum qualifications.[8] J.P. never objected to Jack's role as interpreter or asked the court to inquire further into Jack's background at any time during the seven day trial. Under RAP 2.5(a), this court has discretion to reach an asserted error raised for the first time on review amounting to manifest error affecting a constitutional right. Assuming, without deciding, that an interpreter's lacking minimum qualifications resulting in a complete failure of interpretation would fall within RAP 2.5(a), and given that we are presented with a ruling by the trial court that Jack was qualified to interpret a language for which certified interpreters are not available, we review Jack's qualifications as disclosed in the record to determine whether they are sufficient to support the trial court's ruling. We conclude they are. We do not reach any issue concerning when a trial court may rely on an interpreter who is not certified under RCW 2.43.030 for languages for which interpreters have been certified, and we do

---

[8] The Department cites State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), but that case discusses merely the requirement of a timely objection to evidentiary error in general.

not reach any issue concerning whether errors in appointing interpreters may be waived in general.

C

First, J.P. claims the trial court did not make a preliminary determination, adequately informed by J.P.'s representations, that Jack was able to accurately interpret communications to J.P. as required under RCW 2.43.030(2)(a). Br. of Appellant, 56. Second, J.P. claims the record does not establish Jack read and understood the code of ethics for judicial interpreters that was in effect at the time of the termination hearing as required under RCW 2.43.030(2)(b). We disagree with both claims.

The need to rely on the posttrial, postappeal reference hearing is an unusual circumstance, and not one that can readily stand in for fully qualifying an interpreter in the first instance. In this case, it is important to our analysis that J.P. made no objection to Jack's interpreting services at any time during trial, the record shows instances when Jack sought clarification indicating his attentiveness to the risk of misinterpretation, Jack had served as interpreter on several occasions already in this matter, and, especially, J.P. relied on Jack's interpreting services for his own confidential consultations with counsel again without raising any concerns. J.P. did not seek to develop a record challenging Jack's qualifications or services during this trial even at the reference hearing. Although, for reasons discussed further below, we conclude Jack was qualified in this case, we do not conclude it

is necessarily true that an after-the-fact reference hearing can support an interpreter's qualification in a matter.[9]

GR 11.2 serves as the code of professional responsibility for judiciary interpreters. Interpreters must adhere to five canons of interpretation: accuracy, competence, honesty and integrity, impartiality and neutrality, and confidentiality. GR 11.2(f)(1)-(5). Under "accuracy," interpreters "must reproduce in the target language the closest natural equivalent of the source language message without altering it by means of addition, omission, or explanation." GR 11.2(f)(1). Under "competence," interpreters "must not knowingly accept any assignment beyond their skill level." GR 11.2(f)(2). Any doubts an interpreter has about their ability to

---

[9] The current bench card available to Washington judges suggests a more comprehensive inquiry when seeking to qualify a noncertified interpreter at the commencement of a proceeding. It suggests inquiry as follows:

- What language will you be interpreting?
- Please summarize your qualifications as an Interpreter.
- What is your experience interpreting in court?
- Do you believe you can communicate effectively for the court and the LEP individual?
- Do you have any interest in the outcome of this matter?
- Have you read the Code of Professional Responsibility for Judiciary Interpreters? GR 11.2
- Do you promise to abide by this Code, interpreting accurately, honestly, impartially and maintaining confidentiality?
- Will you be interpreting simultaneously or consecutively?

I find you qualified/I do not find you qualified to interpret for this proceeding.
. . . .
Do you swear (affirm) that you will make a true interpretation to the best of your skill and judgment?

WASH. CT. INTERPRETER COMM'N, BENCH CARD: COURTROOM INTERPRETING (SPOKEN LANGUAGES) 3 (Jan. 2021), (boldface omitted), https://www.courts.wa.gov/content/publicUpload/Interpreters/BenchCard.pdf [https://perma.cc/6YLZ-T76M].

17

satisfy an assignment competently must be immediately disclosed to all parties and the court, if applicable. Id. Interpreters are prohibited from giving legal or other advice or engaging "in any activity that may be construed as a service other than interpreting or translating." Id. Under "honesty and integrity," interpreters "have an inviolable duty to provide honest services in which their behavior upholds the values outlined in this code. They must accurately represent their credentials, training, and relevant experience." GR 11.2(f)(3). Under "impartiality and neutrality," interpreters "must faithfully render the source message without allowing their own views to interfere. They must refrain from conduct that may give an appearance of bias and must disclose any real or potential conflict of interest to all parties and the court, if applicable, as soon as they become aware of it." GR 11.2(f)(4). Under "confidentiality," interpreters "must not divulge privileged or other confidential information obtained in their professional capacity. They must refrain from making any public statement on matters in which they serve." GR 11.2(f)(5).

The trial court was not required to base its preliminary determination only on J.P.'s representations, testimony, or stated needs. Although the majority of information came from the reference hearing, the trial court relied on sufficient evidence, including Jack's testimony, to conclude under RCW 2.43.030(2)(a) that Jack was capable of communicating effectively with both the court and J.P.

The trial spanned seven days and produced more than 600 pages of transcript, yet J.P. identifies only two instances he contends demonstrate inadequate interpreting. J.P. points to the two instances during his own testimony where the Department requested Jack to repeat the answers. J.P. argues Jack's

repeated answers materially changed the initial response, and the exchanges do "not instill confidence that the interpreter was qualified and able to meet his ethical obligations." We disagree that these instances establish inadequate interpreting by Jack. The answers, which were repeated on these occasions, were capable of suggesting slightly different nuances about the frequency of J.P.'s physical behaviors towards the children, but the answers are also capable of being viewed as essentially consistent. The Department independently showed that J.P. exhibited consistent, frequent, and a high level of physical behavior toward the children escalating to criminal behavior and leaving them lastingly fearful of him. Nor do the different nuances that J.P. argues on appeal bear on the central errors he advances, concerning whether the Department showed it understandably offered all court ordered services and whether substantial evidence supports the trial court's conclusions as to each child.

J.P.'s confidence in Jack's interpretation skills is evidenced by J.P.'s own actions. J.P.'s attorney explicitly requested Jack's services to assist interpreting attorney-client communications. J.P.'s attorney requested Jack sight interpret several written passages of English-language documents during trial. Certain portions of admitted documents were interpreted for the purposes of refreshing J.P.'s recollection. At no point during the trial did J.P. or his attorney raise concerns about the accuracy of Jack's interpretations. Even at the reference hearing, at no time did J.P. make a record that any inadequate interpreting occurred despite the reference hearing offering another opportunity to do so.

19

Through his testimony at the reference hearing, Jack demonstrated he understood and complied with the first four canons of the ethics code. Although neither the trial court nor counsel asked Jack if he was familiar with and understood the "confidentiality" canon, the record of Jack's providing confidential interpreting services at J.P.'s request for conferences with counsel supports the conclusion that Jack respected his confidentiality obligations. The record does not support and no party alleges on appeal that Jack failed to understand or violated that canon of the code of professional responsibility. We conclude the trial court did not err when it found Jack had read, understands, and would abide by the code of ethics for language interpreters established by court rules under RCW 2.43.030(2)(b). The trial court did not abuse its discretion when it found Jack satisfied the requirements under RCW 2.43.030(2).

III

Parents have a fundamental liberty and privacy interest in the care and custody of their children. In re Dependency of M.-A.F.-S., 4 Wn. App. 2d 425, 445, 421 P.3d 482 (2018). However, when parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child. Id. at 445-46. In an action to terminate parental rights, the State must prove six statutory elements under RCW 13.34.180(1) by clear, cogent, and convincing evidence. M.-A.F.-S, 4 Wn. App. 2d at 446. Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be " 'highly probable.' " In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re

Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). " 'This burden [of proof] is so substantial that, when properly applied, it will be met in only extraordinary circumstances.' " In re Custody of A.L.D., 191 Wn. App. 474, 501, 363 P.3d 604 (2015) (alteration in original) (quoting In re Custody of C.C.M., 149 Wn. App. 184, 204, 202 P.3d 971 (2009)). The burden of proof in a termination trial is on the Department. In re Termination of Parental Rts. M.A.S.C., 197 Wn.2d 685, 698, 486 P.3d 886 (2021).

We give the trial court's decision great deference and will uphold its findings of fact if they are supported by substantial evidence. In re Dependency of G.G., Jr., 185 Wn. App. 813, 828, 344 P.3d 234 (2015). Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise. In re Adoption of M.J.W., 8 Wn. App. 2d 906, 925, 438 P.3d 1244 (2019). We do not weigh the evidence or the credibility of witnesses. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001).

A

1

J.P. argues the Department failed to meet its statutory burden under RCW 13.34.180(1)(d) because it did not show by clear, cogent, and convincing evidence that the Department expressly and understandably offered trauma-focused therapy. We disagree.

RCW 13.34.180(1)(d) requires the Department to show that court ordered services "have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental

21

deficiencies within the foreseeable future have been expressly and understandably offered or provided." FF 16(d) states, in part, "The Department expressly and understandably offered and provided [J.P.] with all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." The court found, "This included court ordered services."

The record supports the trial court's finding. J.P. testified he called Consejo in about May 2021 and was told he did not qualify for trauma therapy and they did not know who McGee is. McGee testified she referred J.P. to Consejo, she asked J.P. several times to complete the therapy, and Consejo said J.P. could start or complete trauma therapy on his own.[10] The trial court found McGee offered J.P. services through service letters and discussed provider services in meetings with J.P. Although J.P.'s testimony contradicts McGee's, determining the credibility of witnesses and weighing evidence remains wholly in the domain of the trial court. See T.R., 108 Wn. App. at 161. J.P. focuses on FF 16(e), which states that J.P. did not want to participate in reconciliation therapy, without referencing trauma therapy. J.P. argues that trauma therapy was an independent court ordered service that was required to be offered under RCW 13.34.180(1)(d)—because it was listed as a recommended service by Dr. Washington-Harvey and therefore was a court ordered service under court orders requiring J.P. to follow treatment recommendations.[11] But McGee's testimony makes clear that she explicitly

---

[10] In the context of the trial evidence, "on his own" here refers to J.P.'s starting therapy without the children, who were unwilling to participate.

[11] See Wash. Court of Appeals Oral Argument, In re Dependency of D.J.P., No. 83166-6-I (Mar. 14, 2023), at 0 min., 53 sec. to 2 min., 29 sec., https://tvw.org/video/division-1-court-of-appeals-2023031387/?eventID=2023031387.

offered trauma therapy in addition to family/reconciliation therapy, and that the procedures she followed in finding and scheduling the services and advising J.P. about them remained consistent across both programs. The trial court was entitled to rely on McGee's testimony and substantial evidence exists to support the trial court's finding that the Department offered services including court ordered services under RCW 13.34.180(1)(d).

2

J.P. challenges the trial court's findings of fact 16(d) and 16(e), disputing the trial court's statement that further services would be futile. He argues the trial court could not have simultaneously found the Department offered all court-ordered services and the Department was excused from offering family reconciliation therapy under the futility doctrine. J.P. contends the record does not support a futility finding as it rests on unsupported and irrelevant facts.

The futility doctrine may excuse the Department from providing services if the services would have been futile or would not remedy the parental deficiencies within the child's foreseeable future. In re Dependency of G.J.A., 197 Wn.2d 868, 903, 489 P.3d 631 (2021). However, the State contends, and substantial evidence supports, that the State offered the disputed trauma-focused and family reconciliation services. In defending the trial court's futility finding, the State does not rely on an argument that it should have been excused from offering any court-ordered or necessary services, because McGee's testimony was that she did offer those services. The State argues the trial court's futility finding reflects that

services "did not need to be offered *further*" because of J.P.'s unwillingness to participate.[12]  (Emphasis added.)

McGee assisted J.P. with obtaining reconciliation and trauma therapy services.  Substantial evidence supports the trial court's finding that the Department offered and provided those necessary services.  McGee testified J.P. refused to attend those services without the joint participation of his children.  McGee advised J.P. several times to start therapy services, but he declined.  Accordingly, to the extent services were necessary, reasonably available, and capable of correcting J.P.'s parental deficiencies, substantial evidence exists to support the trial court's finding that the Department offered those services and did not need to make a further offer of them.  Contrary to J.P.'s argument, these two findings are not "internally inconsistent," because FF 16(d) acknowledges the Department made trauma therapy and reconciliation services readily available to J.P., while FF 16(e) acknowledges J.P.'s repeated refusals to participate in those services rendered further efforts futile.

B

FF 13 states, "Despite [J.P.'s] hard work, he cannot have a safe relationship with his children.  The testimony was consistent through the witnesses, the children remain afraid of their father despite four years of Department supervision.  The Children refuse to engage in services with him."  FF 14 states, "T.J.[C.J.P.],

---

[12] In context, it appears that the trial court's finding of futility with respect to offering *further* services is not addressed to the issue of whether the Department offered all services, but the likelihood that conditions would be remedied so as to allow the children's return under RCW 13.34.180(1)(e), given J.P.'s unwillingness to engage in the services the Department offered.

through his counsel, represented that he has no relationship with his father. Notwithstanding the current no contact order, T.J.[C.J.P.] does not want visits with and remains fearful of his father." FF 16(e) states,

> [T]he Department does not have an obligation to offer futile services that would not remedy the parental deficiencies in the foreseeable future. In this regard [J.P.] did not want to participate in reconciliation therapy. [J.P.] testified he did not want to participate because his children would not participate with him. The testimony from providers, [the] CASA, and the social worker made clear that the children in fact did not want to participate in this treatment. . . .
> There is little likelihood that conditions would be remedied such that the children could be returned to [J.P.] in the near future. . . . Based on [McGee's] testimony, the Court finds that it is not likely that [J.P.] is capable of providing care to his children because his children do not have a relationship with him and do not want to see him.

In FF 16(f), the trial court found continuation of the parent child relationship "diminishes all the children's prospects of integration into a stable and permanent home." For the older children, the trial court based this on their voicing that fact themselves, and for the younger children the trial court relied on the therapists' testimony about their behaviors and their experiencing damaging and destabilizing effects of J.P.'s "treatment of the family." J.P. argues there was insufficient evidence to support FF 13 that D.J.P., J.J.P., A.J.P, and N.V.P. remain afraid of him and do not want to engage in reconciliation therapy. J.P. also argues insufficient evidence supports the trial court's findings and conclusions under RCW 13.34.180(1)(e) and (f) for those four children. J.P. does not challenge these findings for T.J.C.J.P. or C.-S.J.P.

Under RCW 13.34.180(1)(e), the Department must establish "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to

the parent in the near future." Under RCW 13.34.180(1)(f), the Department must establish "that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home."

The Department can meet its burden to prove RCW 13.34.180(1)(f) in two ways. In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013); In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013). First, it can prove that prospects for a permanent home exist, but the parent-child relationship prevents the child from obtaining that placement. R.H., 176 Wn. App. at 428. Alternately, it can prove that the relationship has a damaging and destabilizing effect on the child that would negatively affect the child's integration into any permanent and stable placement. Id. RCW 13.34.180(f) " 'is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption.' " M.-A.F.-S., 4 Wn. App. 2d 425, 421 P.3d 482 (2018) (quoting In re Dependency of A. C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004)). For instance, the Department is not required to prove the child has a specific prospect for adoptive placement in a stable and permanent home to satisfy RCW 13.34.180(f). See In re Dependency of Esgate, 99 Wn.2d 210, 214, 660 P.2d 758 (1983) (terminating parental rights over a severally mentally and emotionally disabled child, despite the fact that it was unlikely that the child would ever be adopted). Esgate focused on the overarching goal of protecting the best interests of the child and upheld termination of parental rights because continuation of the parent-child relationship created feelings of insecurity and instability in the child. Id.

26

In K.D.S., the court rejected the State's proposition that presenting evidence sufficient to prove RCW 13.34.180(1)(e) necessarily proves RCW 13.34.180(1)(f). 176 Wn.2d at 646-47. K.D.S. had neuro-behavior disorders that caused her to exhibit extremes in behavior, such as physical outbursts against her caretakers. Id. at 647. The State's witnesses testified that her father's interactions with K.D.S. caused her great distress. Id. at 649. The K.D.S. court noted facts supporting a conclusion under RCW 13.34.180(1)(e) may, but do not necessarily, also support a conclusion under RCW 13.34.180(1)(f). Id. at 655. The existence of overlapping facts between the two elements does not relieve the State of its burden of proving RCW 13.34.180(1)(f) independently of RCW 13.34.180(1)(e). Id. at 656. The record nevertheless contained sufficient evidence to support the trial court's finding that the continued parent-child relationship harmed K.D.S.'s well-being.

J.J.P.

Substantial evidence supports the trial court's FFs 13 and 16(e) as to J.J.P. Dembeck testified whenever J.J.P. brings up J.P. to her, J.J.P. gets very angry. Dembeck reported J.J.P. does not want to ever see J.P. Dembeck testified J.J.P. expressed a desire to be adopted as an outcome for the dependency case. When asked why she filed her motion to stop visitation of J.P. and the children, Dembeck stated the children expressed they did not want to visit with him and were afraid.

The record also supports FF 16(f) as to J.J.P. Dembeck's testimony suggested a continued parent-child relationship between J.P. and J.J.P. would create feelings of insecurity and instability in J.J.P. J.J.P.'s fear of and anger at J.P. bolsters her strong desire to never see J.P. again, and J.J.P. refuses to have

a relationship with J.P. J.J.P. expressed a desire to be adopted and Dembeck testified J.J.P. said J.P. should just let her be adopted. The trial court reasonably concluded maintaining the parent-child relationship has a damaging and destabilizing effect on J.J.P. that would negatively affect her integration into any permanent and stable placement.

A.J.P.

Substantial evidence supports the trial court's FFs 13 and 16(e) as to A.J.P. Dembeck testified that when first visiting A.J.P., A.J.P. would cry nonstop and could not talk about J.P. Dembeck reported A.J.P. expressed "on many occasions" that she does not want to see J.P. When asked why she filed her motion to stop visitation of J.P. and the children, Dembeck stated the children expressed they did not want to visit with him and were afraid. More recently, A.J.P. has "been good" and very bonded to her foster parents. Snider testified A.J.P. "was doing very well" by the time of trial. Snider reported A.J.P. remained worried about returning to J.P.'s care. Snider did not know whether A.J.P. is fearful of J.P. Dembeck's and Snider's testimony constitutes substantial evidence supporting the trial court's findings.

The record also supports FF 16(f) as to A.J.P. Evidence at trial suggests a continued parent-child relationship between A.J.P. and J.P. would create feelings of insecurity and instability in A.J.P. A.J.P. expressed fear of J.P. and stated numerous times that she does not want to communicate with or see him again. At the beginning of her time working with A.J.P., Snider testified A.J.P. presented as worried because of the possible change in placement. Although Snider reported

A.J.P. worried about returning to live with J.P., Snider did not know why this worried A.J.P. Because A.J.P. is "very bonded" to her foster parents and A.J.P. worried about returning to live with J.P., maintaining the parent-child relationship has a damaging and destabilizing effect on A.J.P. that would negatively affect her integration into any permanent and stable placement.

N.V.P.

Substantial evidence supports the trial court's FFs 13 and 16(e) as to N.V.P. Dembeck testified when first meeting with N.V.P., N.V.P. talked a lot about J.P. and the things N.V.P. saw him do and how they scared her. N.V.P. was not particularly open about discussing J.P. with Dembeck, preferring not to talk about him. Dembeck also testified N.V.P. does not want to see J.P. When asked why she filed her motion to stop visitation of J.P. and the children, Dembeck stated the children expressed they did not want to visit with him and were afraid. Johnson could not opine on how N.V.P. felt about J.P. Johnson also had no opinion on whether N.V.P. sought a relationship with J.P. Dembeck's testimony constitutes substantial evidence for the trial court to conclude N.V.P. fears J.P., does not want to see him, and does not want to have a relationship with him.

The record also supports FF 16(f) as to N.V.P. Dembeck reported, "[N.V.P.] doesn't believe that [J.P.] could handle [the children], and that they would, therefore, be neglected in some ways." Dembeck's testimony suggested a continued parent-child relationship between J.P. and J.J.P. would create feelings of insecurity and instability in N.V.P. N.V.P. fears J.P. and refuses to communicate with or see him. The trial court reasonably concluded maintaining the parent-child

relationship has a damaging and destabilizing effect on N.V.P. that would negatively affect her integration into any permanent and stable placement. Substantial evidence exists to support FF 16(f) as to N.V.P.

D.J.P.

While the Department concedes Dembeck's testimony does not support a finding that D.J.P. is afraid of J.P., the testimony shows reunification efforts for D.J.P. would be unsuccessful.[13]  Dembeck testified D.J.P. was only one year old when placed out of J.P.'s care.  Dembeck testified D.J.P. is doing well in her placement.  Combined with the consistent fear all her older siblings express of J.P., the little likelihood conditions would be remedied such that any of her siblings could be returned to J.P. in the near future, and D.J.P.'s strong bond with her siblings, there is evidence that there is little likelihood J.P. could remedy conditions permitting D.J.P. to be returned to him.  In addition, substantial evidence supported the trial court's finding that the near future for D.J.P. was "less than a few weeks" given her young age.  The Department put on evidence showing there is little likelihood conditions will be remedied so that D.J.P.'s five older siblings, all with longer "near future" determinations, can return to J.P.'s care in a "near future" meaningful to them.  In context, this supports an inference that the same is true for D.J.P.  Substantial evidence supports the trial court's FFs 13 and 16(e) as to D.J.P.

---

[13] This concession is logically based on the lack of direct evidence that D.J.P. fears J.P.  D.J.P. is the youngest child and was one year old when the children were removed from D.J.'s custody.  We note that Dembeck testified that "the children" were afraid of J.P.

The record supports FF 16(f) as to D.J.P. Dembeck testified adoption was in all the children's interests, and her testimony suggested a continued parent-child relationship between J.P. and D.J.P. would create feelings of insecurity and instability in D.J.P. Although Dembeck did not always refer to D.J.P. specifically, the living arrangement D.J.P. maintains with her siblings in two separate homes but with frequent visits, together with the evidence of J.P.'s behavior towards all the children, provides substantial evidence supporting the trial court's conclusion that continuation of the parent child relationship diminished D.J.P.'s prospects for integration into a stable and permanent home.

C

J.P. challenges FF 14, arguing the trial court impermissibly "treated [T.J.C.J.P.]'s counsel as a fact-witness through which T.J.C.J.P.'s out-of-court statements were admitted and used for substantive purposes."

Substantial evidence exists to support the findings that T.J.C.J.P. has no relationship with J.P., does not want visits with him, and remains fearful of him. Dembeck testified T.J.C.J.P. was fearful of J.P., as evidenced by the traumatic reaction he had to wrestling since T.J.C.J.P. reported J.P. used to hold him down. Dembeck reported T.J.C.J.P. refused engaging in joint therapy with J.P. and did not want to see J.P. until he is a "full-grown man" so he is capable of defending himself against J.P. Schwimmer testified T.J.C.J.P. reported J.P. is abusive and hit people, and denied any indication that T.J.C.J.P. is emotionally ready to have contact with J.P. This testimony is not challenged on appeal. It supports the trial court's FF 14.

31

We hold substantial evidence supports FF 16(d) as to all children, FFs 13, 16(e), and 16(f) as to D.J.P., J.J.P., A.J.P, and N.V.P., and FF 14 as to T.J.C.J.P.

IV

J.P. argues the trial court made several evidentiary errors that materially affected its findings under RCW 13.34.180(1)(e) and the court's unfitness determination.

A juvenile court has broad discretion in dependency and termination proceedings to receive and evaluate evidence in light of a child's best interest. In re Welfare of X.T., 174 Wn. App. 733, 738, 300 P.3d 824 (2013). However, such discretion does not permit courts to disregard the rules of evidence, especially where the deprivation of parental rights is involved. Id. This court reviews the decision to admit evidence for an abuse of discretion. In re Welfare of M.R., 200 Wn.2d 363, 376, 518 P.3d 214 (2022). An abuse of discretion occurs if a judge's decision was " 'manifestly unreasonable,' " meaning no reasonable person would reach the same conclusion, or it " 'rests on untenable grounds,' " meaning it relied on facts not supported by the record or on an incorrect legal standard. Id. (quoting State v. Griffin, 173 Wn.2d 467, 473, 268 P.3d 924 (2012)). "The admission of evidence which is merely cumulative is not prejudicial error." State v. Todd, 78 Wn.2d 362, 372, 474 P.2d 542 (1970).

J.P.'s arguments on this issue focus on statements offered by McGee admitted over hearsay and foundation objections. Although the trial court overruled most of J.P.'s objections to the testimony of Dembeck and the children's counselors on similar grounds, J.P. does not challenge those rulings on appeal.

32

As we discussed above, substantial evidence exists to support FF 16(e) for the four children J.P. challenges based on Dembeck's testimony and the testimony of the children's counselors. To the extent J.P. asserts the trial court erred in relying on some of McGee's testimony for its RCW 13.34.180(1)(e) determination, the challenged testimony is cumulative with other witnesses' testimony and, under Todd, cannot amount to prejudicial error requiring reversal. Further, we note the trial court sustained many of J.P.'s objections to McGee's testimony and limited her testimony at J.P.'s request in several respects.

V

J.P. argues cumulative error resulted in him being denied a fair trial.

The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal. In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). J.P. does not establish error by the trial court affecting the fairness or the outcome of the proceedings, singly or in combination. The cumulative error doctrine does not apply.

Affirmed.

Birk, J.

WE CONCUR:

Díaz, J.

33